UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
EUGENE LAPOINTE,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )        Civil Action No. 03-2128  (RBW)
                                    )
CRAIG VAN NOTE, <u>et al.</u>,      )
                                    )
            Defendants.             )
_____ )

## <u>MEMORANDUM OPINION</u>

The plaintiff, Eugene Lapointe, brings this action to recover damages for injuries allegedly caused by "defamation and continuing libelous attacks made by [the] defendants," Craig Van Note and Monitor Consortium ("Monitor").[1]  Amended Complaint for Damages and Injunctive Relief ("Compl.") ¶ 2.  Currently before this Court are: (1) the defendants' Motion for Summary Judgment ("Defs.' Mot."); (2) the plaintiff's Opposition to the Defendants' Motion for Summary judgment ("Pl.'s Opp'n."); and (3) the defendants' Reply Memorandum of Points and

_____

[1] On November 9, 2004, this Court granted Earth Island Institute's Motion to Dismiss for lack of personal jurisdiction and dismissed the non-profit organization as a defendant.  Order November 9, 2004; Memorandum Opinion dated November 9, 2004 at 15.  In that same opinion, this Court dismissed all of the plaintiff's claims of defamation that occurred prior to October 17, 2002, on the grounds that the statute of limitations had lapsed as to the 1989 "open letter" claim and the limitation period was not extended by the continuous tort doctrine.  <u>Id.</u> at 15-18.  Therefore, the plaintiff's only defamation claim that remains alive is the Spring 2003 article written by defendant Van Note as the Executive Vice President of defendant Monitor and published in <u>Earth Island Journal</u>.

1

Authorities in Support of Their Motion for Summary Judgment. ("Defs.' Reply Mem.").[2]

## I.  Factual Background

A.    <u>CITES and the Conference of the Parties</u>

The Convention on International Trade for Endangered Species of Wild Fauna and Flora ("CITES") is an international agreement among various governments of approximately 170 countries, which has the objective of ensuring that international trade in specimens of wild animals and plants does not threaten their survival.  Affidavit of Michael Sandifer in Support of Defendants' Motion for Summary Judgment ("Sandier Aff."), Exhibit ("Ex.") A & Ex. B (Deposition of George Furness) ("Furness Dep.") at 24-25.  Countries that have joined CITIES and agree to be bound by the convention are known as parties.  Sandier Aff., Ex. A.

The supreme decision-making body under CITES is the Conference of the Parties ("COP"), which comprises all of the parties or member states to CITES.  Sandier Aff., Exhibit A. The COP meets on a regular basis (approximately every 2-3 years) to determine how a particular plant or animal species should be treated with respect to international trade.  <u>Id.</u> These meetings are designated by the "COP" initials, followed by the sequential number for each individual meeting, <u>e.g.</u>, "COP 7" follows "COP 6." <u>Id.</u>

CITES categorizes species under the following three "Appendices," which dictate the treatment of the species included in them:

1.     Appendix I includes species threatened with extinction.  Trade in specimens of

---

[2] The plaintiff also filed in support of its opposition to the defendant's motion for summary judgment Plaintiff's Traversal of Defendants' Statement of Material Facts and Plaintiff's Statement of Genuine Issues in Opposition to Defendants' Motion for Summary Judgment.

these species is permitted only in exceptional circumstances.

2.      Appendix II includes species not necessarily threatened with extinction, but in

which trade must be controlled in order to avoid utilization incompatible with

their survival.  International trade in specimens of Appendix-II species may be

authorized by the granting of an export permit or re-export certificate.  Permits or

certificates should only be granted if the relevant authorities are satisfied that

certain conditions are met, above all that trade will not be detrimental to the

survival of the species in the wild.

3.      Appendix III contains species that are protected in at least one country, which has

asked other CITES Parties for assistance in controlling the trade.

Id.  Approximately 5,000 species of animals are protected by CITES against over-exploitation

through international trade.  Id.  These animals are listed in the CITES Appendices described

above.  Id.

**B.      The CITES Secretary General**

The office of the CITES Secretariat, which is administered by the United Nations

Environment Program ("UNEP"), is responsible for coordinating, advising, and servicing the

CITES' operations; assisting with communication and monitoring the implementation of CITES

to ensure that its provisions are respected; and, distributing information relevant to the Parties,

for example, proposals to amend the Appendices.  Sandier Aff., Ex. A.  The Secretary General

governs the Secretariat and functions like the chief of the Secretariat.  Furness Dep. at 26.   In the

role of Secretary General, defendant Lapointe was responsible to the COP and CITES. Sandifer

Aff, Ex. C (Deposition of Eugene Lapointe) ("Lapointe Dep.") at 35.  Lapointe had a pivotal and

fundamental role in CITES, functioning as a chief executive officer and providing leadership to the Secretariat on behalf of the CITES conference of the parties.  Id. at 30-31.  He was responsible for executing policies on which the CITES members reached agreement.  Id. at 42. When asked whether the Secretary General's position was a widely known position in the environmental community, he responded "Of course."  Id. at 41.

Lapointe communicated not only the views expressed by the CITES convention, but also his own findings and recommendations on issues that had been discussed. Sandifer Aff., Ex. C (Lapointe Dep.) at 35-36.  And, the Secretariat had an "obligation to step in between the supporters of two different vision" [sic].  Id. at 37-38.  In making recommendations to the Secretariat, Lapointe talked not only to members of CITES and to nongovernmental organizations ("NGO"), but also to the media.  Id. at 38.

**C.      Lapointe's Performance as Secretary General: The African Elephant Controversy**

Lapointe served as the CITES Secretary General from 1982 through 1990, when his contract was not renewed.  Sandifer Aff., Ex. C (Lapointe Dep.) at 29, 119 & Ex. E (Compl.) ¶ 6. Lapointe's position as Secretary General was a widely-known position in the environmental community.  Sandifer Aff., Ex. C (Lapointe Dep.) at 41.  Lapointe essentially functioned as the "boss" of the Secretariat. Sandifer Aff., Ex. B (Furness Dep.) at 27.

In October 1989, the COP had to decide whether or not the African elephant should be transferred from Appendix II to Appendix I of the Convention (i.e., whether or not to impose a complete ban on the ivory trade).  Sandifer Aff., Ex. G (United Nations Joint Appeals Board

Report to the Secretary-General) at 2.  As the Secretary General and on behalf of the Secretariat, Lapointe did not support a blanket ban on ivory trading and he was opposed to listing the African elephant globally on Appendix I.  Sandifer Aff., Ex. C (Lapointe Dep.) at 50.  Lapointe's actions and position on this matter garnered criticism beginning in May or June of 1989 from those who wanted all African elephants listed on Appendix I.  Id.  Allegations also began circulating of illegal activities associated within the CITES Secretariat in the form of corruption.  Id.  These criticisms were broadly publicized prior to the COP 7 meeting.  Id.   Additionally, certain conservation organizations circulated a letter addressed to the Executive Director of UNEP, dated October 16, 1989 (the "October 16, 1989 letter"), criticizing Lapointe's position concerning the elephant issue and calling for his removal from the post of Secretary General.  Sandifer Aff., Ex. C (Lapointe Dep.) at 55-56 & Ex. E (Compl.) ¶ 8.

### D.    Lapointe's Removal from Office

Lapointe was removed from office in November 1990.  Sandifer Aff., Ex. C (Lapointe Dep.) at 255 & Ex. E (Compl.) ¶ 6.   After the Executive Director of UNEP decided not to renew his contract, Lapointe appealed this decision to the United Nations Joint Appeals Board. Sandifer Aff., Ex. C (Lapointe Dep.) at 94, 137.  The Joint Appeals Board of the United Nations reversed the decision of the Executive Director of UNEP not to renew Lapointe's contract.  Sandifer Aff., Ex. G (United Nations Joint Appeals Board Report to the Secretary General) at 15.  Although the United Nations Joint Appeals Board's decision is part of the official record of the United Nations, the parties do not believe that UNEP publicized the decision.  Sandifer Aff., Ex. C (Lapointe Dep.) at 106, 154 & Ex. F (Deposition of Craig Van Note) ("Van Note Dep.") at 142.

As a result, Lapointe issued a press release describing UNEP's decision. Sandifer Aff., Ex. C

(Lapointe Dep.)  at 106, 109 &  Ex. H.   Lapointe distributed the press release to the CITES

parties, his personal friends, journalists with whom he maintained contact, including members of

the American and United Kingdom media, the non-governmental organizations that signed the

Open letter, and various ambassadors.  Sandifer Aff., Ex. C (Lapointe Dep.)  at 109. He did not

attach the entire United Nations Joint Appeals Board's decision to the press release, but instead

appended only to some of the copies of the press release he circulated several paragraphs that

referenced the United Nations Joint Appeals Board's recommendation.  Sandifer Aff., Ex. C

(Lapointe Dep.) at 106,109-110.

**E.      Lapointe's Current Position at IWMC**

 Lapointe currently acts as the President and Chief Executive Officer of IWMC World

Conservation Trust Foundation.  Sandifer Aff., Ex. C (Lapointe Dep.) at 5.  Additionally,

Lapointe frequently lectures and writes articles regarding environmental matters.  Id. at 269-72.

Lapointe consistently promotes himself as the former Secretary General of CITES.  Id. at 272.

**F.      Craig Van Note and the Article at Issue**

Craig Van Note has worked for over 30 years as a conservationist. Sandifer Aff., Ex. F

(Van Note Dep.)  at 12,14.  Van Note founded the first office of defendant Monitor in the early

1970s as a consortium of conservation, environmental, and animal welfare organizations.  Id. at

15, 70.  The organizations include The Humane Society of the United States and Defenders of

Wildlife, among others.  Sandifer Aff., Ex. I.  Van Note is Executive Vice President of Monitor.

Id. at 24-26.  He attends meetings of environmental causes and other groups focusing on wildlife

and habitat conservation.  Id. at 32.

Van Note has attended several COP meetings, including the 1989 meeting that resulted in

Lapointe's removal.  Id. at 32-33.  While Van Note has attended several CITES meetings, he has

not retained documents he received at those meetings, having discarded them.  Id. at 37, 14.

Van Note was aware of the African elephant controversy that was at issue during the

1989 COP 7 meeting.  Id. at 83.   In fact, he testified that "there was profound concern at the

crisis threatening the integrity and effectiveness of the convention because of the ivory battle,

there was definitely that profound concern and that dominated the entire meeting."   Id.  Van

Note contends that he was aware of Lapointe's dismissal through news reports and published

information such as the Vacancy Announcement advertising the position of Secretary General.

Id. at 113-15, 133-34; Sandifer Aff., Ex. J (Monitor Agenda re: vacancy announcement).

Van Note testified that the only document he was specifically aware of regarding

Lapointe's "exoneration" prior to the filing of this lawsuit was the press release, which was

circulated by Lapointe himself.  Sandifer Aff., Ex. F (Van Note Dep.) at 140 & Ex. H;.

Additionally, Van Note testified that he did not believe that the UNEP decision was publicly

available because other organizations had attempted to gain access to the document without

success.  Van Note Dep. at 142.  And although the information is available in the official record

of the United Nations, there is no evidence UNEP ever  publicly released United Nations Joint

Appeals Board's decision.  Sandifer Aff., Ex. C (Lapointe Dep.) at 106, 154 & Ex. F (Van Note

Dep.)  at 140-41.

G.    **The Article at Issue**

The allegedly libelous article in this case, entitled "Victories at Cites," provides historical information regarding CITES, including information on progress made in conserving wildlife and an overview of the CITES Secretariat.  Sandifer Aff., Exhibit L.   The article also included information on various issues, such as whaling, the sale of ivory and mahogany, among other conservation related issues.  Id.  Additionally, the article discusses the role of various countries and individuals in shaping the environmental issues addressed by CITES.  Id.

The article as a whole does not focus on one particular individual but instead provides a broad perspective of CITES' activities.  Id.  In the context of this broad perspective, the article includes a brief reference to the plaintiff and the incident surrounding his removal from office. Id.  Specifically, the challenged portion of the article states:

> During the '80s, the Secretariat vehemently opposed banning the ivory trade, despite a poaching crisis that left 100,000 carcasses strewn across the African landscape each year and the utter failure of a hopelessly weak CITES ivory monitoring system.  At the 1989 CITES meeting in Switzerland, CITES Secretary-General Eugene Lapointe lobbied fiercely against the proposed Appendix I listing for the African elephant (Asian elephants were already totally protected).  He even held press conferences during the meeting to subvert the proposal.  Lapointe touched off outrage in leading conservation nations.  An inquiry by the United Nations Environment Programme (UNEP) led to Lapointe's removal on grounds of malfeasance.
>
> Unfortunately, little changed at the Secretariat after Lapointe's firing.  His replacement was a bumbling UNEP bureaucrat who allowed the CITES staff - all cronies of Lapointe - to continue their anti-protection ways.

Id.  It is this statement in the four-page article that is the subject of the present lawsuit.

Plaintiff's Traversal of Defendants' Statement of Material Facts at 7, ¶ 56; Defs.' Mem. at 10.

## II.  Standard of Review

Courts will grant a motion for summary judgment under Rule 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  When ruling on a summary judgment motion, courts must view the evidence in the light most favorable to the nonmoving party.  Bayer v. Dep't of Treasury, 956 F.2d 330, 333-334 (D.C. Cir.1992); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (holding that courts must draw "all justifiable inferences" in the nonmoving party's favor and accept the nonmoving party's evidence as true). However, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" Bias v. Advantage Intern., Inc., 905 F.2d 1558, 1561 (D.C. Cir. 1990) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986)).  Rather, the nonmoving party must "provide evidence that would permit a reasonable [fact-finder] to find" in its favor. Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  Under Rule 56 (c), "if a party fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial," summary judgment is warranted. Hazward v. Runyon, 14 F. Supp. 2d 120, 122 (D.D.C. 1998) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  In considering a motion for summary judgment, "the court...may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

### III. Legal Analysis

The defendants seek summary judgment on the grounds that neither defendant Van Note nor defendant Monitor are liable for defamation because: (1) the plaintiff is a public figure as a matter of law and (2) the plaintiff cannot show by clear and convincing evidence that defendant Van Note acted with actual malice when he authored the article at issue.   Defs.' Mem. at 13.   In response, the plaintiff contends that he is not a "a limited public figure" because he did not "voluntarily eject himself into a public controversy."   Pl.'s Opp'n. at 10 (citation omitted). Instead, the plaintiff asserts that the defendants themselves created the underlying controversy they claim elevated him to limited public figure status.   Id.   Further, the plaintiff asserts that even if the Court determines that he is a limited public figure, there is clear and convincing evidence that the article at issue was written with malice.   Id. at 12.

First Amendment protection is afforded to defendants when the object of an alleged defamatory statement is about a public official or public figure.   New York Times v. Sullivan, 376 U.S. 254 (1964).   The issue of whether a plaintiff is a public figure is a question of law for the court to determine.   See Waldbaum v. Fairchild Pubs., Inc., 627 F.2d 1287, 1294 n. 12 (D.C. Cir.1980).   Courts have determined that there are two types of public figures: (1) general public figures who maintain such status for all purposes and (2) limited-purpose public figures ""(who voluntarily inject[] [themselves] or [are] drawn into a particular public controversy and therefore become[] . . . public figure[s] for a limited range of issues.'"   Id. at 1292 (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1974)).   Here, this Court finds that the evidence does not demonstrate that the plaintiff is a general public figure. See Waldbaum, 627 F.2d 1292 (under what is a very strict test a person is a public figure only if he has "attained a position 'of such

persuasive power and influence' . . . and of 'such persuasive fame or notoriety' . . . that he has become a public figure in all situations if such status is established by "clear evidence") (citations omitted).[3]   Moreover, the parties concede that one issue before the Court is whether the plaintiff is a limited-purpose public figure.  Defs.' Mem. at 14; Pl.'s Opp.'n at 10.

The District of Columbia Circuit has formulated a three-prong test to determine whether an individual is a limited-purpose public figure.  Lohrenz v. Donnelly, 350 F.3d 1272, 1279 (D.C. Cir. 2003) (citing Waldbaum, 627 F.2d at 1294).  First, courts must determine whether a public controversy existed.  See Waldbaum, 627 F.2d at 1296.  This assessment requires courts to "isolate the public controversy," that is, to determine whether there was "a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." Id. at 1297.  Second, the court must analyze the plaintiff's role in the controversy. Id.   "Trivial or tangential participation is not enough . . . . [To be considered a limited-purpose public figure, a plaintiff] must have achieved a 'special prominence' in the debate." Id.  The District of Columbia Circuit has determined that to satisfy the "special prominence" requirement "[t]he plaintiff either must have been purposely trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution." Id.  Finally, the court must determine whether the "alleged defamation [was] germane to the plaintiff's participation in the controversy." Id.  at 1298.  As applied here, the

---

[3]  A general public figure, a rare creature, is a person that possesses general fame or notoriety in the community and is pervasively involved in the affairs of society. See Waldbaum, 627 F.2d 1292 (citing Gertz, 418 U.S. at 352).  "A person can be a general public figure only if he is a 'celebrity' [and] his name is a 'household word.'" Waldbaum, 627 F.2d 1292.  The public usually recognizes the words and deeds of the  general public figure, either because it regards his ideas, conduct, or judgment as worthy of its attention or because it actively pursues that consideration. Id. at 1292, 1294.

defendants have established that the plaintiff is a limited-purpose public figure as determined by Waldbaum's three prong test.

Turning to the first prong of the Waldbaum test, in assessing "whether a controversy indeed existed . . . , [a] judge must examine whether persons actually were discussing some specific question." Waldbaum, 627 F.2d at 1297.  Here, during Lapointe's tenure at CITES, and specifically at the seventh COP meeting, an issue that was debated concerned whether certain African elephants should be placed on Appendix I (and provided complete protection from hunting) and/or Appendix II (and provided limited protection). Sandifer Aff., Ex. F (Van Note Dep.) at 83.   In determining whether the controversy assumed a public face,"[t]he court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment."  Id.  Here, the defendants have provided evidence that the dispute regarding the African elephant extended beyond the parties involved with CITES and received public attention through its coverage by the media.  Sandifer Aff., Ex. F (Van Note Dep.) at Exs. 1-3; Jennifer Chaney Affidavit ("Chaney Aff."), Ex. B (Furness Dep). at 34-36; Chaney Aff., Ex. C (Favre Dep.) at 21-22.  The plaintiff also testified that he held press conferences to explain his recommendations to the delegates and the media.  Sandifer Aff., Ex. C (Lapointe Dep.) at 257-58.  Courts have found generally that "a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way," Waldbaum, 627 F.2d at 1296, is a public controversy.  Similarly, in Thompson  v. Nat'l. Catholic Reporter Publishing Co., 4 F. Supp. 2d 833, 838  (E.D. Wis. 1998), the court found that a corporation's decision to transfer 2,000 Milwaukee area jobs to non-union locations in the southern United States was a public controversy under the first prong of Waldbaum because the elimination of

jobs attracted widespread public comment and controversy, including pleas from community and religious leaders to reverse the decision.  See also, Clyburn v. News World Communications, Inc., 903 F.2d 29, 32 (D.C. Cir. 1990) (District of Columbia Circuit found that whether city official was source of drugs for woman who died of drug overdose and whether city officials attended party where overdose occurred were public controversies); Trotter v. Jack Anderson Enters., Inc., 818 F.2d 431, 434-35 (5th Cir. 1987) (Fifth Circuit found that anti-union violence at Guatemalan Coca-Cola bottling company was a public controversy because of the proximity of other Western Hemisphere countries to Guatemala, thus, social and political turmoil occurring there aroused particular concern in the United States, including but not limited to, the attention of the media, political leaders, human-rights organizations, labor-unions, and Coca-Cola shareholders.); Smith v. A Pocono Country Place Prop. Owners Ass'n, 686 F. Supp. 1053, 1057-58 (M.D. Pa. 1987) (district court determined that while dispute over the membership of a board of directors of an association was not of national or even state-wide importance, it was a public dispute of concern to the residents of the local community, especially members of the association; therefore, it was a public controversy.); Schiavone Constr. Co. v. Time, Inc., 619 F. Supp. 684, 703 (D.N.J. 1985) (issue of whether nominee to be Secretary of Labor of the United States is fit to serve and how the Federal Bureau of Investigation investigates fitness of such potential federal officials is a "genuine public controversy").

As noted above, the District of Columbia Circuit has held that "[i]f the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy." Waldbaum, 627 F.2d at 1297.  The dispute concerning, whether African elephants should be provided complete protection from extinction by being listed globally on

Appendix I, surely had foreseeable and substantial ramifications that would impact individuals who were not direct participants in the debate.  Whether enhanced protection would be provided to the African elephant population would have inevitable consequences on the trade of ivory, which is used to manufacture products for human use, and countries that were members of the COP were required to comply with resolutions pertaining to the listing of species that were adopted by the conference.  Sandifer Aff, Ex. A & Ex. C (Lapointe Dep.) at 42.  Accordingly, the Court finds that the African elephant issue was a public controversy that had foreseeable and substantial ramifications for non-participants in the debate.[4]  The first prong of Waldbaum has therefore been satisfied.

The defendants have also satisfied the second prong of the Waldbaum test– that the plaintiff is a limited purpose public figure.  The plaintiff served as the Secretary General of the office of the CITES Secretariat, which is administered by UNEP, from 1982 through 1990.  Sandier Aff., Ex. A. & Ex. C (Lapointe Dep.) at 30-31;  In the role of Secretary General, the plaintiff  was responsible to the conference of the parties and CITES. Sandifer Aff, Exhibit C (Lapointe Dep.) at 35.  The plaintiff occupied a significant position in CITES, functioning as its chief executive officer and leader of the Secretariat on behalf of the CITES conference of the parties.  Id.  at 30-31.  He was also responsible for executing policies approved by the CITES

---

[4] The plaintiff's removal from office was also intertwined with his public involvement and recommendations concerning the level of protection the African elephant should be afforded.  Sandifer Aff., Exhibit G (United Nations Joint Appeals Board Report to the Secretary General) at 6.  Since the plaintiff allegedly publicly opposed  a complete ban on the ivory trade and lobbied the media for support of his position prior to the meeting of the Conference of the Parties, the Executive Director of UNEP, Dr. Tolba, considered the plaintiff's actions as unacceptable and a breach of the Secretary General's neutrality as a servant of the parties.  Id.  Therefore, the plaintiff's contract as Secretary General was not renewed.  Id.

members.  Id. at 42.   The plaintiff communicated not only the views expressed by the CITES

convention, but also his personal findings and recommendations on issues that had been

discussed. Id. at 35-36.  Such issues included the African elephant controversy, and the plaintiff's

publicly expressed opposition to a blanket ban on the trading of ivory, by listing the African

elephant globally on Appendix I.  Id.  at 50.  The Secretariat could not assume an impartial

position on issues, including the African elephant controversy, but had an "obligation [to choose

a side] and to step in between the supporters of two different vision[s] [sic].[5]  Id. at 37-38.  In

making recommendations, the plaintiff talked not only to members of CITES and to non-

governmental organizations, but also to the media.  Id. at 38.  Although the plaintiff contends that

he is not a limited-purpose public figure because "he did not inject himself into public

controversy," Pl.'s Opp.'n at 10, the plaintiff held a decision making position as CITES Secretary

General and publicly stated his opposition to a blanket ban on the trade of ivory.  Sandifer Aff,

Ex. C (Lapointe Dep.) at 29, 50, 119.  The District of Columbia Circuit has held that "[t]he

plaintiff either must have been purposely trying to influence the outcome or could realistically

have been expected, because of his position in the controversy, to have an impact on its

resolution."  Waldbaum, 627 F.2d at 1297.  As a result of the responsibilities plaintiff had as the

Secretary General of CITES, which required him to communicate the views expressed by the

CITES convention, as well as his own findings and recommendations on issues that could have

global ramifications, including whether to place the African elephant on Appendix I and provide

complete protection for the species, the Court must conclude that the plaintiff's participation in

---

[5] As noted already, the Secretary General in charge of the Secretariat, the plaintiff was like the chief of the Secretariat.  Furness Dep. at 26.

the African elephant controversy was not "[t]rivial or tangential." Waldbaum, 627 F.2d at 1297.

Rather, it amounted to sufficient involvement that resulted in the plaintiff achieving special

prominence in the debate.  See Contemporary Mission Inc. v. New York Times Co., 842 F.2d

612, 618 (2d Cir. 1998) (Second Circuit based determination that plaintiffs were limited purpose

public figures in part on fact that they "openly availed themselves of the media, issuing press

releases, making public statements, and addressing 'open letters'"); Little v. Breland, 93 F.3d

755, 758 (11th Cir. 1996) (Eleventh Circuit found that plaintiff's decision to assume  position of

leadership as president of a corporation, an organization involving public scrutiny, constituted

voluntary decision by plaintiff to place himself in situation where there was a likelihood of public

controversy);  Perks v. Town of Huntington, 251 F. Supp. 2d 1143, 1168 (E.D.N.Y. 2003) (

district court found that plaintiff, through his own voluntary and repeated contact with the media,

rendered himself a public figure for the purpose of commenting on his lawsuit against the

defendants); Carr v. Forbes, Inc., 121 F. Supp. 2d 485, 492 (D.S.C. 2000) (district court found

that plaintiff "assumed a role of special prominence" in public controversy by frequently acting

as the leader of and prominent spokesman for public-private projects that were the central issue

of the controversy).

      Finally, the defendants have also satisfied the third prong of the Waldbaum test–that the

allegedly defamatory statements were germane to the plaintiff's participation in the African

elephant controversy.   The defendant contends that the challenged statements are inextricably

intertwined with the controversies. Defs.' Mem. at 17.   In determining whether the statements

were germane to the plaintiff's participation in the controversy, "the court must ask whether a

reasonable person would have concluded that [the plaintiff] would play or was seeking to play a

16

major role in determining the outcome of the controversy and whether the alleged defamation

related to that controversy." Waldbaum, 627 F.2d at 1298. The Court concludes that the

defendants have presented sufficient evidence to support a finding that the allegedly defamatory

statements in the subject article were inextricably intertwined with both the African elephant

debate and the plaintiff's removal as Secretary General.

First, the challenged section of the article addresses the plaintiff's role  as the Secretary

General of CITES. Second, the article highlights the plaintiff's  recommendations both as

Secretary General and on behalf of the Secretariat not to support a blanket ban on the trade of

ivory by listing the African elephant on Appendix I. Sandifer Aff, Ex. C (Lapointe Dep.) at 50.

Third, the article reports the plaintiff's use of the media to advocate not only the views expressed

by the CITES convention, but also his personal  findings and recommendations regarding the

African elephant controversy. Id. at 35-36. Finally, the Executive Director of UNEP's (Dr.

Tolba) decision not to renew the plaintiff's contract was related to the plaintiff's involvement in

the public debate regarding the African elephant. Sandifer Aff., Exhibit G (United Nations Joint

Appeals Board Report to the Secretary-General) at 6. Specifically, Dr. Tolba decided to replace

the plaintiff because he

> had lobbied in the media, before the meeting of the Conference of
> the Parties, to further his (Lapointe's) point of view on proposals
> put forward on the future status of the African elephant. [Dr.
> Tolba] viewed this as unacceptable and a breach of the Secretary
> General's neutrality as a servant of the Parties.

Id. Due to the plaintiff's responsibilities as Secretary General, his participation in the African

elephant controversy was not trivial or tangential, but was of such significance that the plaintiff

achieved special prominence in the debate and " a reasonable person would have concluded that

17

[the plaintiff] would play or was seeking to play a major role in determining the outcome of the

[African elephant] controversy and whether the alleged defamation related to that controversy."

<u>Waldbaum</u>, 627 F.2d at 1298.

Courts have found in cases analogous to the instant action that because of a plaintiff's

public position as a leader or advocate on controversial issues, allegedly defamatory statements

relating to such issues were germane to the plaintiff's participation in the controversy.  In

<u>Thompson</u>, a federal district court found that a plaintiff, who served as the Director and Vice-

President of Corporate Communications for Briggs & Stratton and frequently and publicly

defended the company's decision to eliminate 2,000 jobs at its Milwaukee facility, served more

than a "trivial or tangential" role in the controversy.  4 F. Supp. 2d at 838.  In dicta, the court

noted that the purportedly defamatory "articles were published to emphasize the social and

economic consequences of job transfers, both with respect to Briggs & Stratton and other

companies."  <u>Id.</u> at 839.  Since the plaintiff was a key public spokesperson and Vice-President of

Corporate Communications for Briggs & Stratton , the court found that the purportedly

defamatory statements were germane to the plaintiff's participation in the controversy.  <u>Id.</u>;  <u>see</u>

<u>also</u>, <u>O'Donnell v. CBS, Inc.</u>, 782 F.2d 1414, 1417 (7th Cir. 1986) (Seventh Circuit, focusing on

the plaintiff's participation in the controversy, found that  "[plaintiff] acted as an advocate of a

particular point of view in the [Environmental Protection Agency] controversy, and his removal

from a media position through which he sought to influence the controversy [was] necessarily

germane to his participation in the controversy");  <u>Nicholson v. Promotors on Listings</u>, 159 F.R.

D. 343, 344 (D. Mass. 1994) (district court found that alleged defamation was germane to the

plaintiff's participation in the controversy when he assumed management role at public

auditorium and sought to influence the resolution or outcome of the controversy over its finances).  Here, since the defendants' article concerned the plaintiff's opposition to listing the African elephant on Appendix I during his tenure as Secretary General and his removal from that position by the Executive Director resulted from his public opposition to a complete ban on the international trade of ivory, the Court finds that both situations are inextricably intertwined and germane to the plaintiff's involvement in the African elephant controversy.   Accordingly, the Court finds that as the Secretary General of CITES, the plaintiff became a voluntary limited-purpose public figure.

As a public figure, the plaintiff bears the burden of proving that the defendants acted with malice, and not merely ordinary negligence, in publishing the alleged defamatory statements about him in the article.  The Supreme Court has held that the First Amendment shields a defendant from liability for defamation claims made about a public figure unless the public figure plaintiff can show by clear and convincing evidence that the defendant has published a defamatory falsehood with "actual malice."  See Sullivan, 376 U.S. 254 at 279-280, 285-286. Thus, the District of Columbia Circuit explained in Tavoulareas v. Piro, that the plaintiff must show, by clear and convincing evidence, that when the defendants published the alleged defamatory article they were subjectively aware that it was highly probable that the story was "(1) fabricated; (2) so inherently improbable that only a reckless person would have put it in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that the defendant[s] had obvious reasons to doubt." 817 F.2d 762, 790  (D.C. Cir. 1987) (internal quotation marks and citation omitted.)

The plaintiff contends that he was defamed by the subject article, including but not limited to, the statements that he "vehemently opposed the ivory ban," "lobbied fiercely against the proposed Appendix I listing," "held press conferences to subvert the proposal . . . [, which] touched off outrage," and was "fired for malfeasance."  Plaintiff's Traversal of Defendants' Statement of Material Facts at 7; Defs.' Mot. at 10.  The plaintiff posits that these alleged defamatory statements were made by the defendants  with actual malice because they knew the statements were not true or were made with reckless disregard of their truthfulness.  Pl.'s Opp'n. Mem. at 12.  The plaintiff argues further that the "defendants' sources were patently unreliable because [the] defendants themselves were the real sources and they are notorious muckrackers." Id.  In response, the defendants assert that the plaintiff's claim that the challenged section of the article was published with actual malice must fail because the plaintiff has not produced any evidence that defendant Van Note knew that the statements in the article were false or that he entertained serious doubts as to their veracity.  Defs.' Mem. at 21.

This Court finds that the plaintiff has not presented sufficient evidence to support a finding that when the defendants published the alleged defamatory article they were subjectively aware that it was highly probable that the representations in the story were false or that they acted with reckless disregard for the truth.  Defendant Van Note has provided evidence that he relied on his personal knowledge, as well as other published reports, in drafting the challenged sections of the article.  Specifically, Van Note testified that he became aware of the controversy surrounding the plaintiff and the African elephant through both his attendance at the seventh

meeting of COP and his review of numerous articles.[6]  Sandifer Aff., Ex. F (Van Note Dep.) at 113-115; 133-134.

The plaintiff contends that the United Nations Joint Appeals Board's determination that he was wrongfully discharged demonstrates that the defendants published the article with actual malice because the defendants had prior access to the board's decision and the plaintiff's press release.  Pl.'s Mem. at 13; Sandifer Aff., Ex. G.  Notwithstanding the plaintiff's contentions,  the Court finds that the plaintiff has not presented sufficient evidence to support a finding that the defendants acted with a reckless disregard for the truth.  Defendant Van Note testified that he did not believe the decision reversing the plaintiff's discharge was publicly available.  Sandifer Aff., Ex. F (Van Note Dep.) at 140-141, 145.  Van Note's belief that the Board's decision was not publicly available is supported by the plaintiff's own testimony that he could not speculate as to whether the United Nations  published the decision.  Sandifer Aff., Ex. C (Lapointe Dep.) at 106.  Further, the plaintiff testified that  "UNEP, which was at the losing end of [the] decision was not going to provide the [decision] to anybody."  Id. at 154.  Nonetheless, notwithstanding the plaintiff's own testimony regarding the possible unavailability of the Board's decision, he asserts that the defendants, at a minimum, had access to his press release, which included as an attachment, excerpts of the Board's decision exonerating him regarding allegations concerning

---

[6] The plaintiff testified that he relied on several published stories and narratives in drafting the challenged passage in his 2003 Article, "Victories at CITES," including but not limited to, (1) an article in The Times of London entitled "UN's top ivory ban official dismissed" (1990); (2) an excerpt from the cover article from Time magazine entitled  "Trail of Shame," by Ted Gup (October 16, 1989); (3) an excerpt from a book entitled "Battle for the Elephants," by Iain and Oria Douglas-Hamilton (1992); (4) an excerpt from a book entitled "Dominion," by Matthew Scully (2002); and (5) an excerpt from a book entitled "The Fate of the Elephant," by Douglas H. Chadwick (1992).   Van Note Aff. at 2, Exs. 1-4.

his removal for cause as Secretary General. Pl.'s Mem. at 13. Although the parties dispute whether the defendants received and were cognizant of the plaintiff's press release, at the summary judgment stage the Court must view the evidence in the light most favorable to the nonmoving party. See Fed.R.Civ.P. 56(c); see also Anderson, 477 U.S. at 255; Bayer, 956 F.2d at 333-34. Nevertheless, viewing the evidence from this perspective, the Court concludes that the plaintiff has failed to meet his burden by demonstrating with clear and convincing evidence that when the defendants published the allegedly defamatory article they were subjectively aware that it was highly probable that the story was false or that they acted with reckless disregard for the truth.

This case is analogous to Lohrenz v. Donnelly. 350 F.3d 1272 (D.C. Cir. 2003). There, the plaintiff, one of the first female combat pilots in the United States Navy, sued the Center for Military Readiness and its president for publishing allegedly defamatory statements that the plaintiff was not qualified to fly combat jets and that the Navy had given her special accommodations because she was a woman. Lohrenz, 350 F.3d at 1276. In Lohrenz, the defendants relied on a detailed letter written by Lieutenant Patrick Burns, a former F-14 instructor of the plaintiff, who provided information to the defendants that the plaintiff was allegedly "a substandard pilot who should not be flying and who had been assigned to the F-14 program on account of a politically driven policy." Id. at 1276, 1284 (internal quotation marks omitted). The plaintiff appealed the decision of another member of this Court who found that the plaintiff had failed to present sufficient evidence from which a reasonable jury could find by clear and convincing evidence that the defendants published the statements with actual malice. Id. at 1274. The plaintiff argued on appeal that "[the defendants] had to resolve doubts about the

specific facts of the [plaintiff's] performance record once credible evidence was placed before them to cause them 'obvious reasons' to doubt the reliability of the information they had previously trusted . . . ." <u>Id.</u> at 1284.  The District of Columbia Circuit rejected this position, holding that "[e]ven where doubt-inducing evidence could be discovered, a publisher may still opt not to seek out such evidence and may rely on an informed source, so long as there is no 'obvious reason to doubt' that source.'" <u>Id.</u> at 1285 (citing <u>McFarlane v. Esquire Magazine</u>, 74 F.3d 1296, 1305 (D.C. Cir. 1996)).

In the present action, the plaintiff argues that the "defendant[s'] sources were patently unreliable because [the] defendants themselves were the real sources and they are notorious muckrakers."  Pl.'s Opp.'n Mem. at 12.   However, the defendants have provided evidence that defendant Van Note relied on his own personal knowledge and independent third party publications in drafting the challenged article.  Defs.' Reply Mem. at 16-17.  Consistent with the District of Columbia Circuit's conclusion in <u>Lohrenz</u>, "that [merely because the defendants] acted on the basis of a biased source and incomplete information does not 'demonstrate with clear and convincing evidence that the defendant[s] realized that their statement was false or that they subjectively entertained serious doubts as to the truth of their statement,'"   <u>Lohrenz</u>, 350 F.2d at 1284 (citing <u>Bose Corp. v. Consumers Union of U.S.</u>, 466 U.S. 485, 511 n. 30 (1984), this Court finds that the plaintiff has not presented sufficient evidence to support a finding that when the defendants published the alleged defamatory article they were subjectively aware that it was highly probable that the representations in the article were false or that they acted with reckless disregard for the truth.

23

Even assuming, however, that the defendants received and were cognizant of the plaintiff's press release that included excerpts of the Board's decision, there is no evidence in the record that the Board's full decision was published and available for review by third parties such as the defendants and other non-governmental organizations.  Publishers of defamatory statements are not required to accept "'denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.'" Lohrenz, 350 F.3d at 1285 (citing Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 691 n. 37 (1989)) (citations omitted).  Further, although the plaintiff asserts that the Board's full decision was made available to all who inquired, the "failure to verify statements with the plaintiff and reliance upon some biased sources, in themselves, do not amount to reckless disregard of the truth."  Lohrenz, 350 F.2d at 1286 (quoting Loeb v. New Times Communications Corp., 497 F. Supp. 85, 93 (S.D.N.Y. 1980)).  Accordingly, this Court finds that the plaintiff has not satisfied his burden of proving that the defendants acted with malice.

## IV.  Conclusion

Based on the foregoing analysis, the defendants' motion for summary judgment as to the plaintiff's defamation claim is **GRANTED.**[7]

---

[7] Also pending before the Court are the defendants Motions In Limine, Defedants' Motion in Limine to Preclude the Introduction of Evidence of Medical Testimony to Support Claim of Damages for Emotional Distress  and Defendants' Motion in Limine to Preclude the Introduction of Evidence of Actual Damages Based Upon Reduced Revenues of International Wildlife Management Consortium , filed on August 18, 2006.  Since the Court is granting the defendants' motion for summary judgment, the defendants' Motions in Limine are denied as moot.  An Order consistent with the Court's ruling shall be filed contemporaneously herewith.

24

SO ORDERED.

REGGIE B. WALTON
United States District Judge